UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SEPHORA USA, INC., a Delaware corporation, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> J.B. HUNT TRANSPORTATION, an Arkansas ) <br> corporation; BDS Transport LLC, a Utah ) <br> corporation; and DOES 1-10, inclusive ) <br> ) <br> Defendants. ) | Case No.: 5:12-cv-3252-PSG <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> **(Re: Docket Nos. 36, 48, 63)** |

In this carrier liability dispute, Defendant J.B. Hunt Transportation et al ("Defendants") moves for partial summary judgment.[1] Plaintiff Sephora USA, Inc. ("Sephora") opposes the motion. The parties appeared for oral argument. Having considered the papers and arguments of counsel, the court hereby DENIES Defendants' motion.

**I.   BACKGROUND**

Sephora develops and sells cosmetic products and toiletries around the world. Sephora contracts with external providers to transport its products to retail stores. Defendant J.B. Hunt Transport ("JBHT") provides such services as a cargo-shipper.

---

[1] *See* Docket No. 36.

1

Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

### A.     Preliminary Negotiations

In early 2010, Sephora and JBHT entered negotiations for JBHT to provide shipping services for Sephora.[2] The primary contact points for these negotiations were Evan Hendrix ("Hendrix") for JBHT and Janet Begunich ("Begunich") for Sephora. The negotiations continued for more than six months by both phone and email.

On January 20, 2010, Begunich informed Hendrix by email that an average truckload of Sephora products was valued at approximately $500,000.[3] Hendrix asked if she would like rates based on that value, for which he would need to seek approval from higher management, or if she would prefer quotes based on a lower value.[4] Begunich indicated that while Sephora would be most interested in rates based on a $500,000 value, Sephora did carry its own insurance on the products and would therefore be interested in looking at other options if the rates would be significantly higher for a $500,000 load.[5]

On February 1, 2010, Hendrix emailed Begunich a packet of documents called the "Total Transportation Solution," which provided Sephora with shipping rates based on $100,000 and $250,000 total liability per truck and included a clause indicating that for higher fees, JBHT could make shipments bearing greater liability.[6] Neither party contends that a contract was entered into based on these rates. For the next several months, JBHT made shipments for Sephora based on "spot rates," as negotiations continued for a longer term contract.[7]

### B.     June 25-30, 2010 Email Exchange

---

[2] *See* Docket No. 36 at 2.

[3] *See id.* at 3.

[4] *See id.*

[5] *See id.*

[6] *See id.*

[7] *See* Docket No. 48 at 3.

2
Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

On June 25, 2010, Begunich emailed Hendrix to solicit a quote for certain shipments due to be moved that Friday, July 2, 2010.[8] Hendrix asked whether Begunich would like spot rates or long-term rates, and she responded that she would prefer long-term.[9]

On June 29, 2010 Hendrix send Begunich with spot rates for the July 2 shipment, with a promise that his long term rates would follow.[10] Begunich responded with a request for more information about JBHT's liability limits. The next day, Hendrix responded that it was going to be "difficult" to find trucks to carry the some of loads with $250,000 or more in liability. The parties exchanged several more emails expressly referencing both the July 2 shipments and the longer term quotes to be forthcoming, discussing rates, insurance, and fuel surcharges. That afternoon, Begunich asked Hendrix, "Can you rate them ALL at $100K liability? I think that is acceptable." Hendrix provided quotes based on that liability limit, and JBHT shipped the July 2 freight.

The parties continued negotiating for several more months over permanent, long-term rates for Sephora. On August 5, 2010 Begunich emailed Hendrix a copy of a rate agreement signed by her supervisor, Martin Flaherty ("Flaherty").[11] Hendrix informed Begunich that those rates would be good for one year.[12] However, the rate agreement in question did not specifically mention anything about the carrier's liability limits.[13] On August 20, 2010, Hendrix sent Begunich an email with the subject line "increasing cargo value," in which he offered to limit Sephora's shipments to

---

[8] *See id.*

[9] *See id.*

[10] *See* Docket No. 36 at 4.

[11] *See* Docket No. 45, Exh. 24.

[12] *See id.*

[13] *See id.*

3
Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

carriers with cargo liability limits at $250,000 and above, but he never received a response to that email.[14]

**C.    February 17, 2011 Shipment**

Sephora arranged for JBHT to deliver a truck load of products from Salt Lake City, Utah to Kent, Washington, with pick up on February 17, 2011.[15]  For this shipment, JBHT was acting under the assumption that the $100,000 liability limit requested by Begunich on June 30 and (in their opinion) cemented by the August 5, 2010 agreement was at work, so it did not designate the loads "high value," and follow the advanced protocols in place for such shipments.[16]  Sephora, on the other hand, was under the impression that the August 5, 2010 agreement had not included any liability limitation, and that none was at play in the February 17, 2011 shipment.[17]

The shipment was picked up as scheduled on February 17, 2011 by a JBHT contractor, who completed a bill of lading prepared by Sephora.[18]  The bill of lading contained neither a statement of value nor a statement of liability limitations.[19]

On February 18, 2011, the driver entrusted with Sephora's cargo reported that it had been stolen.[20]   JBHT reported the theft to their insurer, who assigned an investigator to the matter.[21]  On February 23, 2011, Sephora's insurer also hired a private investigation firm to look into the

---

[14] *See* Docket No. 36 at 8.

[15] *See id.* at 9.

[16] *See id.*

[17] *See* Docket No. 48 at 6-7.

[18] *See* Docket No. 36 at 9-10.

[19] *See* Docket No. 36 at 10.

[20] *See id.*

[21] *See id.*

4
Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

theft.[22]  In late March, $367, 551.69 worth of the cargo was recovered, out of the original $510,793.26 worth of product.[23]  There are conflicting reports about the investigation teams' working relationship, and their relationship with the Los Angeles Police Department.[24]

On June 22, 2012, Sephora filed this suit alleging a single cause of action for damage to cargo.[25]  Sephora seeks $369,521.13 in damages for the value of the lost product, as well as $223,003.75 in investigation costs.  Defendant argues that its liability was limited at $100,000, and hiring an investigative firm went beyond what was reasonable for mere mitigation, so they are not liable to reimburse for those costs.

JBHT now moves for partial summary judgment on two grounds.[26]  First, it seeks summary judgment establishing that it is entitled to limit its liability to $100,000 under the Carmack Amendment.[27]  Second, it argues that Sephora has failed to raise any issues of material fact that would establish that it has a right to recover the cost of investigation under the Carmack Amendment.[28]

## II.     LEGAL STANDARDS

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29]  There are two distinct steps to a motion for summary judgment.  The moving party bears the initial burden of production by

---

[22] *See* Docket No. 48 at 7.

[23] *See id.* at 10.

[24] *Compare id. with* Docket No. 36 at 11.

[25] *See* Docket No. 34.

[26] *See* Docket No. 36.

[27] *See id.* at 1.

[28] *See id.*

[29] Fed. R. Civ. P. 56(a).

5

Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a triable issue of material fact.[30] Where the moving party has the burden of proof at trial, he must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."[31] If the moving party does not bear the burden of proof at trial, however, he may satisfy his burden of proof either by proffering "affirmative evidence negating an element of the non-moving party's claim," or by showing the non-moving party has insufficient evidence to establish an "essential element of the non-moving party's claim."[32] If the moving party meets its initial burden, the burden of production then shifts to the non-moving party, who must then provide specific facts showing a genuine issue of material fact for trial.[33] A material fact is one that might affect the outcome of the suit under the governing law.[34] A dispute is "genuine" if the evidence is such that reasonable minds could differ and find for either party.[35]

At this stage, the court does not weigh conflicting evidence or make credibility determinations.[36] Thus, in reviewing the record, the court must construe the evidence and the inferences to be drawn from the underlying evidence in the light most favorable to the non-moving party.[37]

---

[30] *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[31] *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

[32] *Celotex*, 477 U.S. at 331.

[33] *See id.* at 330; *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 630, 630 (9th Cir. 1987).

[34] *See Anderson*, 477 U.S. at 248.

[35] *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir. 1987).

[36] *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

[37] *See Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Liability Limitation

The parties agree that the general measure for commercial carrier liability is the actual loss to the shipper. They also agree that the Carmack Amendment created an exception to that general rule, under which a carrier may limit its liability to a certain amount if it follows certain protocols. The Ninth Circuit addressed these protocols in *OneBeacon Insurance Company v. Haas Industries*.[38] *OneBeacon* explains that a party seeking to limit its liability must: (1) provide the shipper with a copy of the shipping rate classification, rules, and practices in writing; (2) give shipper a reasonable opportunity to choose between two or more levels of liability; (3) get shipper's consent to the choice of liability limitation; and (4) issue a bill of lading or receipt before moving the shipment that reflects any agreement to limit liability.[39]

Here, the parties fundamentally disagree as to whether or not there was an agreement in place regarding liability in February 2011, and if so, what it provided. Their disagreement turns on a question of interpretation: in Begunich's June 30, 2010 email, when she asked Hendrix to limit "ALL" the shipments to $100,000 in liability, was she referring just to the shipments for the coming Friday, or did she mean all shipments to be shipped with JBHT in the future? When read in context of the overall communications between Sephora and JBHT, the sentence is ambiguous. While the sentence itself emphasizes "ALL," that phrase cannot be read in isolation.[40] It came in the middle of a week-long email chain, and although the emails discuss long-term rates for

---

[38] 634 F.3d 1092, 1099 (9th Cir. 2011).

[39] *See id.* at 1100.

[40] *See, e.g., Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 433 (9th Cir. 2011) ("language in a contract must be interpreted as a whole"); *Bob Lewis Volkswagen v. Universal Underwriters Grp.*, 571 F. Supp. 2d 1148, 1153 (N.D. Cal. 2008) ("language in a contract must be construed in the context of that instrument as a whole.")

7

Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

Sephora, they focus primarily on the July 2 cargo. Because the two topics are not clearly separated within the emails, it is not clear from the face of the document whether the "them" in question referred simply to the rates for the July 2 shipments or to the longer-term rates that were also in discussion.

Because the document is facially ambiguous, the court may look to parol evidence to clarify its meaning.[41] In addition to the language of the email itself, and Hendrix' email of August 20, JBHT points to Hendrix' "unequivocal" deposition testimony that the email committed Begunich to a $100,000 liability limit "from that point on" as conclusive evidence that such a limitation was in place.[42] Sephora, however, argues that the email only limited JBHT's liability for the July 2, 2010 shipments.[43] It points to the equally unequivocal declaration and deposition testimony of Begunich's supervisor, Martin Flaherty, to substantiate its interpretation.[44] This dispute in interpretation underlies the analysis of multiple *OneBeacon* factors.

In order to resolve this dispute and issue a ruling on summary judgment, the court would be required to decide which testimony correctly describes the contract, making it clear that the fact is

---

[41] *See, e.g.*, *Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG,* 460 F. App'x 709, 711 (9th Cir. 2011) ("Under California law, parol evidence may be admitted to explain ambiguity in a . . . contract.").

[42] *See* Docket No. 36 at 13.

[43] *See* Docket No. 48 at 14.

[44] Defendants object to the consideration of Flaherty's declaration and deposition testimony on the grounds that it is hearsay, improper opinion testimony, and lacks foundation. However, the evidence submitted is sufficient to establish, and it is uncontested, that Flaherty was Begunich's supervisor at Sephora and would therefore have knowledge of their internal operations. He has testified and is available to testify at trial as to his first hand, personal knowledge of their operating procedures, which would govern the authorization needed by Begunich to commit to long term liability limitations. He can also testify from first-hand knowledge as to any conversations that he had or did not have with Begunich in connection with her June 30 email. This admissible evidence could be used to persuade a reasonable jury that Sephora's interpretation of the contract is correct, making it relevant to the case at hand. Defendants' objections are therefore overruled.

8
Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

material to the resolution of the case.[45] Because credibility determinations are the traditional province of the jury,[46] it would be inappropriate for the court to make such a determination at this time. Defendants' motion for summary judgment on the issue of liability limitations is therefore DENIED.

### B. Mitigation Expenses

Defendants also seek summary judgment as to the reasonableness of Sephora's mitigation expenses. Sephora seeks reimbursement for costs incurred by its insurer in hiring a private investigation firm to look into the theft of Sephora's cargo. Defendant alleges that this conduct is unreasonable because no court would ever have mandated such measures. Sephora counters that because the cargo was eventually recovered through the investigation of the private firm, and the costs of retaining that firm plus the value of the goods lost is a reasonable damage rate.

Summary judgment is only appropriate on a question of reasonableness where no reasonable jury could find that the actions were appropriate.[47] Specifically, the Ninth Circuit has consistently found that "in many areas of law," "summary judgment is generally an inappropriate way to decide questions of reasonableness because the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment."[48] In this circumstance, given that the total damages sought (the value of the cargo recovered plus the costs of mitigation) are less than the value of the cargo lost, a reasonable jury may find that the actions

---

[45] *See First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) (genuine issue of material fact exists where the trier of fact would be required to resolve differing versions of truth at trial).

[46] *See United States v. Rosales,* 7 F. App'x 766 (9th Cir. 2001) ("the question of the credibility of witnesses is one for the jury) (citing *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931)").

[47] *See McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

[48] *Eid v. Alaska Airlines, Inc.,* 621 F.3d 858, 868 (9th Cir. 2010); *see also Ortiz v. Bank of Am. Nat. Trust & Sav. Ass'n*, 852 F.2d 383, 387 (9th Cir. 1987) ("the reasonableness of mitigation efforts . . . is a question of fact").

9
Case No.: 5:12-cv-3252 PSG
ORDER DENYING SUMMARY JUDGMENT

were warranted. The court therefore declines to deprive the jury of the option to consider evidence on this point, and summary judgment on the matter is DENIED.

**IT IS SO ORDERED.**

Dated: October 10, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge